PETER KASTNER, Respondent, v. A. C. ANDREWS, Doing Business as Andrews Grain Company, Appellant.

(194 N. W. 824.)

**Sales — delivery of grain to warehouse held "bailment" and not sale.**

Plaintiff, as holder and assignee of storage tickets representing grain stored by him and others with the G. U. Co-op. Elevator Company, a public warehouse, sued the defendant in conversion. Defendant was a grain commission merchant and had loaned money to the elevator company under a contract that it should be used in buying grain and in defraying incidental expenses, the borrower agreeing to ship to the defendant the grain purchased to be handled by the latter on commission with the privilege of applying the proceeds on the debt. The elevator company had shipped to the defendant grain required to redeem outstanding storage tickets, which grain the defendant sold, retaining the proceeds and crediting it on the elevator company's debt. It is *held:*

1. Under § 3114 of the Compiled Laws of North Dakota for 1913, the delivery of grain to a warehouse under contract whereby the latter agrees to deliver a like amount and grade to the holder of the receipts, is a bailment and not a sale.

**Warehouseman — statutes held to contemplate continuous bailment of grain until redemption of receipts.**

2. The above statute, considered in connection with § 3113 of the Compiled Laws of 1913 and with §§ 9, 10, 16, 23, 24 and 54 of the Uniform Warehouse Receipts Act, chapter 250, Session Laws of 1917, contemplates a continuous bailment until redemption of the receipts, notwithstanding the right of the warehouseman to mingle fungible goods with other goods and to substitute one mass for another, thus destroying the identity of the grain of a particular depositor.

**Warehouseman — where amount of grain stored is less than required to satisfy outstanding receipts, warehouseman cannot confer good title upon purchaser.**

3. Where the mass, which is owned in common by the holders of the outstanding warehouse receipts up to the aggregate of their receipts, is reduced below that which is required to satisfy outstanding receipts, the warehouseman cannot confer good title upon a purchaser.

Note.—For authorities discussing the question as to whether the storage of grain in bulk in warehouse shall be regarded as a bailment and not a sale, see note in 136 Am. St. Rep. 238; 27 R. C. L. 978; 3 R. C. L. Supp. 1543.

**Warehouseman — holder of warehouse receipt not estopped to assert title as against purchaser in good faith from warehouseman.**

4. The holder of a warehouse receipt or storage ticket is not estopped to assert his title as against a purchaser in good faith from a warehouseman.

**Warehouseman — remedy of receipt holder upon surety bond of warehouseman not exclusive.**

5. The remedy of a receipt holder upon the surety bond of a public warehouseman is not exclusive.

Opinion filed July 18, 1923.

Sales, 35 Cyc. p. 31 n. 29; Warehousemen, 40 Cyc. p. 406 n. 68, 71; p. 407 n. 79 New; p. 422 n. 93 New; p. 449 n. 14.

Appeal from the District Court of Burleigh County, *Berry, J.* Affirmed.

*H. A. Libby,* for appellant.

*Murphy & Toner, McLearn & Gilbertson* and *Sullivan, Hanley, & Sullivan,* filed briefs in support of appellant's position.

"One who merely received from another, who has wrongfully sold the property of a third person, the proceeds of such sale is not guilty of conversion." 28 Am. & Eng. Enc. Law, 2d ed. p. 700 and cases there cited.

"A person having merely a limited interest in a chattel, may sell such interest without being guilty of a conversion." 28 Am. & Eng. Enc. Law, 2d ed. p. 700 and cases there cited; Leuthold v. Fairchild, 35 Minn. 99; Towne v. St. Anthony & D. Elev. Co. 8 N. D. 200, 77 N. W. 608; Citizens Nat. Bank v. Osborne-McMillan Elev. Co. 21 N. D. 335, and cases cited; Plano Mfg. Co. v. N. P. Elev. Co. 53 N. W. 302; Gillette v. Roberts, 57 N. Y. 28; Barrett v. Warren, 3 Hill, 348; Abernathy v. Wheeler, 92 Ky. 320; Parker v. Middleton, 24 Conn. 207; Valentine v. Duff, 34 N. E. 453; Bigelow, Leading Cases, Torts, p. 446; National Exchange Bank v. Wilder, 34 Minn. 142; Ferguson v. Talcott, 7 N. D. 183; Sanford v. Duluth & D. Elev. Co. 2 N. D. 6; Kellogg v. Olson, 34 Minn. 103, 24 N. W. 364; Caldwell v. Pray, 41 Mich. 307; Kohl v. Lynn, 34 Mich. 360; Jones, Chat. Mortg. ¶ 455.

*Charles L. Crum, William Langer* and *S. L. Nuchols,* for respondent.

*A. G. Divet* and *McIntyre, Burtness & Robbins,* as amici curiæ, filed briefs in support of respondent's position.

These "findings of fact," as we understand the rule in North Dakota, are entitled to the same weight in an action at law, as the verdict of a jury, and are to be so treated on appeal; and are not to be disturbed unless they are clearly against the preponderance of the evidence. Bank v. Webber (N. D.) 124 N. W. 952; Dowogiac Mfg. Co. v. Hellekson, 13 N. D. 257; Ruettell Ins. Co. v. Greenwich, 16 N. D. 546.

An agent can be guilty of conversion. The rule is definitely announced in the text in 28 Am. & Eng. Enc. Law. 2d ed. 688 in the following language: "An agent or servant who converts the property of a third person is liable in trover for such conversion and it is no defense that his acts were committed in pursuance of his employment and for the benefit of his employer or master; and this is true though the servant or agent acted under the bona fide belief that his master or principal was the owner of the property and in ignorance of the true owner's rights, since one who interferes with personal property, must at his peril see that he is protected by the authority of the true owner. Thus, where a broker or agent purchases goods from one having mere possession and without authority to sell and delivers such goods to his principal, he is liable for conversion. So, where an agent, such as an auctioneer, broker, factor, etc., sells property for one who has no title thereto, and transfers the possession thereof to a purchaser, he is liable for conversion. It has been held, however, that there is no liability for the conversion on the part of an agent who merely negotiates a sale for his principal without in any way interfering with the property, or who as agent merely collects the purchase money for goods wrongfully sold by his principal."

Under S. D. Rev. Code 1919, §§ 9751, 9753, 9754, 9758 and 9760, relative to grain warehouses, which recognize the inadequacy of warehouse facilities and the necessity of transferring grain to the terminal market and selling it, the holder of the storage ticket is not entitled to restoration of the identical grain stored and cannot demand it at the elevator where it was stored, and the warehouseman is only required to deliver an equal number of bushels of like grade, either at the warehouse or at the terminal market." Nicholson v. Poehler Co. 284 Fed. 992.

"Defendants, though commission merchants doing business as such,

in the matter of the sale of the wheat in question and the appropriation of the proceeds thereof to the payment of the Walbridge indebtedness, acted in their own interest and in their own behalf and not as mere agents for Walbridge, and are liable as for its conversion." Dolliff v. Robbins, 86 N. W. 772.

BIRDZELL, J. This is an appeal from a judgment in favor of the plaintiff in an action for the conversion of grain. The complaint alleges that between the 19th day of October, 1920, and the 1st of March, 1921, certain named persons, plaintiff among them, deposited grain for storage in the elevator of the Glen Ullin Co-operative Elevator Company at Glen Ullin, North Dakota, and that between the 17th day of March, 1921, and the 16th day of June, while the persons storing said grain were owners in common thereof, the defendant without the knowledge and consent of such persons and in violation of their rights did take and convert the same to his own use; that the original holders of the negotiable storage receipts, except the plaintiff, sold and assigned them for value to the plaintiff in this action; that the elevator company issuing the receipts is unable to honor them either by delivery of the grain or the payment of the value thereof; that at the time of the conversion of the grain the defendant knew that the same was stored with the elevator company as bailee and that the storage receipts were outstanding; and that the plaintiff had demanded the grain and redelivery was refused. The answer denies the conversion, puts the plaintiff upon proof as to the quantity of grain stored, for which he claims to hold storage receipts, and, in addition, alleges that the Glen Ullin Co-operative Elevator Company, during the time mentioned in the complaint, also received grain from the producers and shipped it in the usual course of the elevator business, and that from time to time it shipped to the defendant certain consignments to be handled and sold by him on the market; that the consignments were so received by the defendant and were sold for the use and benefit of the Glen Ullin Co-operative Elevator Company; that defendant had paid the elevator company for all the grain so shipped to him; that the defendant had no knowledge or notice that storage tickets were outstanding for any of the grain so handled by him. The case was tried in the district court of Burleigh county before Honorable H. L. Berry, district judge, without a jury, a jury having been waived.

The findings of fact are substantially in accordance with the allegations in the complaint, except that the court did not find that the plaintiff had demanded of the defendant the redelivery of the grain. It did find, however, that the plaintiff went to the defendant's office in Minneapolis and demanded a settlement of his claim on the storage receipts and that a demand for the grain would have been futile. It further appears from the evidence, although there are no findings covering the matter, that an agreement was entered into between the defendant and the Glen Ullin Co-operative Elevator Company, dated September 7, 1920, wherein it was recited that the elevator company was desirous of making arrangements with the defendant for the furnishing by the latter of funds from time to time needed in the business. It was agreed the defendant would loan and advance funds to the elevator company upon the understanding that they be used exclusively in buying grain and seed at the elevator and defraying the incidental expenses of conducting the business. The elevator company agreed on its part to ship to the defendant the grain and seed purchased to be handled for the former on commission, as such business is usually done, at Minneapolis, Minnesota,—it being understood that the defendant should make sales either in the form of options or as cash sales according to its best judgment. It was also agreed that the defendant should be entitled to deduct from the proceeds of sales any sum owing by the elevator company. It further appeared that the elevator company had given a warehouseman's bond in the sum of $5,000. As to a small portion of the grain in controversy, it appears that the elevator company had deposited it for storage in another warehouse in Glen Ullin and that the defendant had demanded and received the warehouse receipt issued therefor, later disposing of the grain and crediting the elevator company with the proceeds.

The principal, if not the sole, question to be determined upon this appeal is whether or not the defendant, in receiving and selling stored grain, applying the proceeds on its account with the elevator company and later refusing to honor the storage tickets issued by the latter, is guilty of conversion.

Obviously the first and primary matter to be considered in the solution of this question is the relationship between the elevator company first issuing the storage receipt and the holder of the receipt.

In the light of our statute and the former decisions of this court, this relationship is firmly established as being that of bailor and bailee. The statute, §§ 3113 and 3114, Comp. Laws 1913, in part reads:

Sec. 3113. "Each storage receipt issued in this state shall expressly provide that at the option of the holder of such receipt the kind, quality and quantity of grain for which such receipt was issued shall be, on his demand, delivered back to him, at any terminal point or at the same place where it was received upon the payment of a reasonable charge per bushel for receiving, handling, storage and insurance charges; and in case of terminal delivery the payment, in addition to the above, of the regular freight charges on the gross amount called for by the tickets being surrendered. . . . Nothing in this section shall be construed to require the delivery of the identical grain specified in the receipt so presented, but an equal amount of the same grade of grain or in lieu thereof a receipt issued by a bonded warehouse or elevator company doing business at terminal points, for an equal amount of grain of the same grade; provided, that grain placed in a special bin be excepted from the provisions of this section."

Sec. 3114. "Whenever any grain shall be delivered to any person, association, firm, or corporation doing a grain, warehouse, or grain elevator business in this state and the receipt issued therefor provides for the delivery of a like amount and grade to the holder thereof in return, such delivery shall be a bailment and not a sale of the grain so delivered, and in no case shall the grain so stored be liable to seizure upon process of any court in an action against such bailee, except actions by owners of such warehouse receipts to enforce the terms thereof, but such grain shall at all times in the event of the failure of insolvency of such bailee be first applied exclusively to the redemption of outstanding warehouse receipts for grain so stored with such bailee. And in such event grain on hand in any particular elevator or warehouse shall first be applied to the redemption and satisfaction of receipts issued by such warehouse." In Dammann v. Schibsby Implement Co. 30 N. D. 15, 151 N. W. 985, this court, following St. Anthony & D. Elevator Co. v. Dawson, 20 N. D. 18, 126 N. W. 1013, Ann. Cas. 1912B, 1337, said:

"From the very earliest time there had been a dispute as to whether a person who delivered grain to a public warehouseman and took

therefor a storage receipt had parted with his title to the grain. This dispute arose naturally from the difficulty of identifying the grain so stored. Some authorities held such a transaction to be a sale because, as they say, the identical grain cannot be returned. Other authorities held the deposit to be merely a bailment and the fact that the identical grain cannot be returned is immaterial in view of the fact that a like amount of the same kind and grade answers every requirement of the return.

"Those courts which held that the depositor had parted with his grain, of necessity held that no action could be maintained for its conversion. This for the very good reason that a man who has no wheat cannot maintain an action against somebody else for converting it. It might be said in passing that those decisions were made in the absence of statute upon the subject."

The court then, after referring to the statute quoted above, said (page 20):

"After the enactment of this statute the question was not an open one in North Dakota."

The only modification of this statute (if it be a modification) that has been called to our attention or that it is necessary to consider in this connection is the Uniform Warehouse Receipts Act, chapter 250 of the Session Laws of 1917. This act, in § 9, provides that a warehouseman is justified in delivering goods, subject to the three following sections, to (a) one who is lawfully entitled to the possession or his agent; (b) to one who is either himself entitled by the terms of a nonnegotiable receipt or who has written authority from the person so entitled; (c) to one who is in possession of a negotiable receipt by the terms of which the goods are deliverable to him or to the bearer. It further provides, in § 10, that delivery is unauthorized where the warehouseman delivers the goods to one who is not in fact lawfully entitled to the possession and that the warehouseman shall be liable as for conversion to all having a right of property or possession if he deliver the goods otherwise than as authorized in the preceding section. It is further enacted, in § 16, that no title or right to the possession of the goods on the part of the warehouseman, unless derived directly or indirectly from a transfer made by the depositor, shall excuse the

warehouseman from liability for refusing to deliver the goods according to the terms of the receipt.

Sections 23 and 24 provide:

Sec. 23. "If authorized by agreement or by custom, a warehouseman may mingle fungible goods with other goods of the same kind and grade. In such case the various depositors of the mingled goods shall own the entire mass in common and each depositor shall be entitled to such portion thereof as the amount deposited by him bears to the whole."

Sec. 24. "The warehouseman shall be severally liable to each depositor for the care and delivery of such mass to the same extent and under the same circumstances as if the goods had been kept separate."

Section 54 provides that any warehouseman who delivers goods out of his possession, knowing that a negotiable receipt is outstanding, without obtaining the possession of such receipt shall, with two exceptions immaterial here, be guilty of a crime.

This statute, as we view it, is in no way inconsistent with the pre-existing statutes heretofore referred to in so far as it touches upon the relation between the depositor and the warehouseman. It rather strengthens and carries out, by logical extension, the express declaration in § 3114, Comp. Laws 1913, that the delivery for storage shall be a bailment and not a sale.

It is argued, however, that the liability of the defendant is not necessarily determined by the consideration that the warehouseman is a bailee. Reliance is placed upon certain holdings of this court, to be hereafter referred to at some length, which, it is contended, recognize the right of the bailee to sell, or at least a power in him to confer a good title by estoppel. It is said that the bailment is made in the light of customs prevailing in the particular business, which customs carry by implication the right to dispose of stored grain and to pass title thereto. The first case relied upon in this connection is that of Marshall v. Andrews, 8 N. D. 364, 79 N. W. 851. In that case Justice Bartholomew, speaking for the court, said p. 368:

"It appears, then, that, while the statute recognizes the right of the bailee to at once ship the grain out of the warehouse, yet as between the bailor and bailee the title to that particular grain remains in the bailor."

A reading of the opinion will disclose that this was said in dis-

cussing the argument advanced by the appellant to the effect that a judgment for the plaintiff against the warehouseman could not stand because the action was in replevin and the verdict was a money verdict, containing no finding as to the ownership or right of possession of any particular wheat. The court, in answering this argument, adverted to the statute for the purpose of showing that the legislature intended to establish the relation of bailor and bailee notwithstanding that the identical grain delivered might not be reclaimed—the receipt being redeemable by grain of similar kind, quality, and quantity. It was the fact that the legislature had provided for such a redemption that led the court to remark, among other things, that "this section recognizes the usual and necessary custom of shipping grain out of the warehouses as the business may require." And further, that "the holder of the receipt cannot insist upon the delivery to him of the identical grain at the place of storage, but he can insist upon the delivery of the same quantity and the same kind and quality of grain." These observations also had a bearing on the defendant's contention that the burden was on the plaintiff to show that his wheat was not destroyed in the fire that destroyed the defendant's elevator. So, in the sense that the statute recognized the right of the warehouseman to substitute grain of like kind and quality for grain stored, it did recognize his right to ship the identical grain out of the warehouse, and this is clearly the sense in which the right of the bailee to do so was treated in that opinion. The opinion disproved the right of the plaintiff to recover specific grain, and hence negatived the contention that the action was in replevin. The court, in finally disposing of the case, held that the evidence was sufficient to establish conversion and that the judgment should be supported as for conversion. Neither the *right* of a warehouseman to *sell* grain required for the redemption of outstanding storage tickets, nor his power to confer a title by estoppel was involved in that case.

· The case of State ex rel. Ertelt v. Daniels, 35 N. D. 5, 159 N. W. 17, is also cited in support of the contention that the warehouseman may pass good title to stored grain. The second paragraph in the syllabus reads:

¡ "While, under § 3113, Comp. Laws 1913, the warehouseman may sell stored grain and upon a demand for the delivery of·grain stored

substitute like grain therefor, yet the ticket holder need not make a demand in the alternative for the same grain or that of equal grade as a basis for conversion, where the ticket holder has demanded the return of his grain or payment of its value."

The action in that case was against the sureties on the warehouseman's bond and was for the benefit of the holders of storage tickets. The case was before the court on a demurrer to the complaint and it was contended that there was not a sufficient allegation of demand and refusal. The specific contention was that, in the light of § 3113, Comp. Laws 1913, to constitute a conversion, it is necessary that the demand shall have been in the alternative,—that is, either for the identical grain or for an equal amount of the same grade—and that a failure to deliver the identical grain would not constitute a conversion inasmuch as the warehouseman had the right to substitute grain of like quality. The holding was merely to the effect that the statute giving the right of substitution did not alter or enlarge the requirements as to demand; that it merely gave to the warehouseman the right to discharge his obligation of redelivery by redeeming in other grain of like quality. In the opinion the Marshall-Andrews Case, supra, was cited as holding that as between the bailor and bailee the title to the particular grain delivered remainded in the bailor. Likewise there was not involved in this case any question as to whether the warehouseman could confer upon a purchaser good title to grain stored which is necessary to redeem outstanding storage tickets.

The case of First Nat. Bank v. Minneapolis & N. Elevator Co. 11 N. D. 280, 91 N. W. 436, is also cited by the appellant as holding that a warehouseman or bailee can confer good title to stored grain upon the purchaser. In that case error was predicated upon the refusal of the trial court to instruct the jury that the conversion, if any, took place at the time and place the wheat was shipped out of the elevator and upon the giving of the instruction that the conversion, if there was such, took place at a later time when the defendant refused to redeliver the wheat upon demand. The court, in speaking of the obligations of the warehouseman, said:

"Its obligations were fixed by the statute, and the fact that it may have mixed the grain with other grain, or that it may have shipped it out, if such was the fact, did not constitute a conversion. Under

the law it could fully comply with its obligations to the owner or person entitled to possession by delivering to such person an equal quantity of wheat of like grade; and only upon a demand by the person entitled to possession, and a refusal on its part, would it be liable for a conversion. Rev. Codes, §§ 1790–1792; Best v. Muir, 8 N. D. 44, 73 Am. St. Rep. 742, 77 N. W. 95; Marshall v. Andrews, 8 N. D. 364, 79 N. W. 851; Towne v. St. Anthony & D. Elevator Co. 8 N. D. 200, 77 N. W. 608. See also Sanford v. Duluth & D. Elevator Co. 2 N. D. 6, 48 N. W. 434."

It is apparent that the court was concerned only with the argument that a conversion takes place the moment stored grain is shipped from the warehouse, and it contents itself merely to point out that, notwithstanding such shipment, the obligations of the storage ticket could be fully met by the delivery of an equal quantity of like grade. The shipping out of the identical grain stored is no more a conversion than is the mixing of the grain with other grain, and the statute which permits substitution authorizes one to the same extent that it authorizes the other. Judicial recognition of this fact, as in the case of First Nat. Bank v. Minneapolis & N. Elevator Co. supra, is not a declaration that a warehouseman may by sale confer upon a purchaser good title to grain required to meet the obligations of outstanding warehouse receipts.

It is significant in this connection to note that the form of the receipt prescribed by the statute in force at the time of the decision in the above case, gave to the holder the option to demand the price or grain at the place where the grain had been received. Subsequently the legislature (see chap. 110, Sess. Laws 1905) provided that he should have the further option of demanding grain at any terminal point and that the obligation may be met by delivering an equal amount of the same grade of grain "or in lieu thereof a receipt issued by a bonded warehouse or elevator company doing business at terminal points, for an equal amount of grain of the same grade." This is a further statutory recognition of the right of substitution,—that which may be substituted being a bonded warehouse receipt. In this the legislature apparently contemplated the continuance of the bailment relation and, to some extent at least, negatived an intention that stored grain needed for redemption of outstanding receipts might be sold.

An additional indication that the legislature intended a continuous bailment and not one capable of being terminated by a sale is found in the provisions fixing the form of the storage receipt. Comp. Laws 1913, §§ 3113 and 3116. These clearly contemplate, and the receipts issued thereunder provide for, the payment of a storage charge which shall include the charges for receiving, elevating, insuring and delivering the grain, being governed by the period elapsing between the issuance of the receipt and its redemption. Such provisions are consistent only with the idea of a continuous bailment. Had it been contemplated that the bailee might rightfully sell and be subsequently accountable only for the value of the grain at the time demand were made upon him, it would seem that a receipt 'making appropriate provisions to · that end would have been prescribed instead of one obligating the bailor to pay continuous storage and insurance charges. We are unable to find, either in the decisions referred to or in the statutes of this state, any recognition of a right on the part of the warehouseman to sell grain required for the redemption of outstanding warehouse receipts.

Our attention is also directed to decisions elsewhere embodying interpretations of the relation of depositor and depositee of grain under the North Dakota statutes and decisions. The principal cases under this head are Northern Trust Co. v. Consolidated Elevator Co. 142 Minn. 132, 4 A.L.R. 510, 171 N. W. 265, and Nicholson v. H. Poehler Co. (D. C.) 284 Fed. 992. In the former case it was said, on the authority of Marshall v. Andrews, 8 N. D. 364, 79 N. W. 851, that under the law of this state a public warehouseman does not become a wrongdoer by shipping stored grain to a terminal elevator, and it is remarked that the proprietor of such an elevator would have no cause. to . suspect that the warehouseman was wrongfully disposing of the grain shipped. These statements may both be justified, but it is submitted that they do not bear directly upon the question in hand. Clearly a public warehouseman does not become a wrongdoer solely · by virtue of the act of shipping stored grain to a terminal elevator, since; by that act alone, he is doing nothing inconsistent with his obligation under outstanding storage receipts. He might take a terminal bonded warehouse receipt or he might have retained enough to satisfy the receipts. That case involved the right of a surety on a warehouseman's

bond to recover, through subrogation, against a purchaser of stored grain. The case was not considered on the basis of the right of a holder of an unredeemed storage ticket as such. While it decided nothing as to the rights of a ticket holder, it seems rather to have been assumed, for the purpose of the opinion, that though the bailor himself might recover, the surety on the defaulting warehouseman's bond, who claimed to be subrogated to the ticket holder's right, could not recover because of the superior equities of the one who had purchased without notice of any wrongful act of the defaulting warehouseman. These equities precluded a recovery by the surety and prevented it from taking advantage of the ticket holder's position. This is clearly reflected by the third and fourth paragraphs of the syllabus prepared by the court, which are as follows:

"The equities of one who buys grain in the open market, in good faith and for full value, from a warehouseman with whom it was stored, are superior to those of the surety on the bond of the latter, given for the protection of those storing grain with it, where such warehouseman has become insolvent and the surety has been required to pay the amount of the bond.

"Because of the superiority of such purchaser's equities, the surety does not become subrogated to rights which the true owners of the grain may have had, to follow it into the hands of the purchaser and to hold the latter as for a conversion thereof."

The case of Nicholson v. H. Poehler Co. arose in South Dakota and the court was primarily concerned with the law of that state. The opinion is a memorandum opinion of District Judge Elliott, and, though the facts are inadequately stated, it is apparent that the case is analogous to the Minnesota case above. Insofar as it purports to interpret the law of North Dakota, it appears to be by way of argument merely, and we are not impressed that the deductions are warranted.

It is conceded by counsel that in Minnesota a warehouseman can confer upon a purchaser no better title than he has and it is said that this is necessarily so in that state by reason of the statute which expressly prohibits the sale by a warehouseman of stored grain.

The Minnesota statute, § 2050 of the Revised Laws of Minnesota, 1905, forbids a warehouseman to sell or otherwise dispose of or deliver out of storage any stored grain without the express authority of the

owner and in return for the storage receipt, under penalty of fine or imprisonment or both; whereas, the North Dakota statute, § 3115, Comp. Laws 1913, provides that a warehouseman, who shall wilfully neglect or refuse, after proper demand, to deliver to the person making the demand the grain or the market value, shall be deemed guilty of larceny, and the Uniform Warehouse Receipts Act, § 54 of chapter 250, Laws of 1917, prohibits the delivery of stored goods out of the possession of the warehouseman without obtaining possession of the receipt, except in the case of perishable goods or upon foreclosure of a warehouseman's lien, or delivery under court order where the receipt is lost.

In commenting upon the Minnesota statute, in the case of Hall v. Pillsbury, 43 Minn. 33, at page 37, 7 L.R.A. 529, 19 Am. St. Rep. 209, 44 N. W. 673 at page 674 the Minnesota court said:

"If the warehouseman be also a dealer in grain, his right to dispose of, as his own, the grain in the warehouse, is limited to that which belongs to him, which he has purchased and put in, or, when deposited by others, which he has purchased from them, and to the excess above what is required to meet his outstanding receipts. The statute clearly enacts that he shall not sell or otherwise dispose of grain on deposit. Its purpose is to provide that the grain shall remain in the warehouse where deposited to meet the call of the owner. . . .

"Much argument has been expended to show the inconvenience to commerce in grain as in such cases the owner of the grain may, notwithstanding a wrongful sale by the warehouseman, follow the grain into the hands of the purchaser. As touching the matter of convenience, the argument has much force. It might tend greatly to facilitate traffic in grain if we had, in respect to it, such a rule as in England pertains to property sold in markets overt. But there is no such rule in this country. The general rule is that an owner of personal property cannot be deprived of his right to it through the unauthorized act of another. That rule applies as well to grain or other property on deposit for the purpose of storing as to property in any other situation."

In our opinion, the civil rights of the parties to a storage transaction are not dependent upon the force of penal statutes. The failure of the legislature to penalize (if it did so fail) the sale of stored grain by a warehouseman does not, in our opinion, give rise to an implication

that it might confer good title upon a purchaser. To so hold would in effect overturn the law of bailments as applied to such transactions.

The most, then, that can be said of our statutes, aside from the Warehouse Receipts Act, chapter 250, Laws of 1917, is that they do not penalize a sale by a warehouseman of stored grain, but they do penalize his wilful neglect or refusal to deliver the grain or pay the market value. They also recognize that a warehouseman may redeem by a terminal bonded warehouse receipt (§ 3113); and they are devoid of any expression modifying the property right of the holder of the warehouse receipt in the grain held by the warehouseman and which is necessary for the redemption of the receipt.

We regard these propositions as established: The holders of warehouse receipts are owners in common of the grain in the warehouse up to the quantity required to redeem the receipts. There is nothing in our statutes which can reasonably be construed as a recognition of an actual authority in the warehouseman to sell stored grain required for the redemption of outstanding receipts. This court has never construed our statutes as conveying any such authority and the decisions relied upon by the appellant merely recognize the legal fiction of separation and substitution in the case of fungible goods. They involve no question concerning a limitation upon the bailee's right to sell from the common mass. When the warehouseman ships grain out and substitutes for it other grain which he has purchased, the grain he places in the common mass passes to the holders of the receipts to the extent required for redemption. The holders of the receipts, then, must remain the owners until their title is lawfully divested. The right of the warehouseman to sell as his own, being necessarily limited to the quantity over that which is required to redeem outstanding receipts, it follows that where stored grain is shipped out and sold to the point where the warehouseman cannot redeem the outstanding receipts, property is sold which the vendor does not own. There remains, then, one further consideration: Is the receipt holder, who delivers grain for storage with the knowledge of the customs prevailing in the grain trade, estopped to assert his title as against a third party purchasing from the warehouseman?

The argument that the receipt holder is estopped is grounded on the proposition that, having stored his grain with the knowledge of a

49 N. D.—68.

prevailing custom, pursuant to which the warehouseman in the ordinary transaction of business will buy and sell and ship out to meet his sales, he vests an ostensible authority as broad as the custom. Following this argument, a deposit of grain carries with it an implied authorization to deal with it in a manner consistent with custom. If this results in a sale to an innocent third party and entails a loss, it is argued that the loss should fall upon the one who by the deposit made the transaction possible rather than upon the innocent purchaser who is justified in dealing with the warehouseman on the strength of his ostensible ownership. Preston v. Witherspoon, 109 Ind. 457, 58 Am. Rep. 417, 9 N. E. 585.

It may be true, as stated, that he who deposits his grain for storage does vest in the bailee indicia of ownership, but so does every bailor. This fact alone does not obviate the rule of caveat emptor, nor does it import the doctrines peculiar to markets overt. The purchaser likewise knows the character of the business transacted by the warehouseman and knows that in the ordinary conduct of such business he will both purchase grain and receive it for storage. This carries notice that his right to sell is limited to the excess above what is required to meet the outstanding storage receipts. Broadwell v. Howard, 77 Ill. 305; McBee v. Ceasar, 15 Or. 62, 13 Pac. 652. Hence, no reason is apparent for making an exception to the rule of caveat emptor. If such an exception should exist in this case to protect a purchaser of stored grain, likewise it should exist to protect a subsequent innocent purchaser of grain once owned by the warehouseman and which he had previously sold to a third party. Applying the exception contended for to successive sales by an elevator company, the result would be that the first purchaser who had paid full value and had obtained perfect title would be precluded from following his property into the hands of the second purchaser who had likewise bought it in good faith. But the law, as we understand it, has been established to the contrary for many years. Kimberly v. Patchin, 19 N. Y. 330, 75 Am. Dec. 334. Yet the first purchaser, who neglects to remove his grain, is as responsible for the apparent ownership as though he had removed it and then returned it for storage.

Much is said in the briefs of counsel concerning the effect upon the grain trade of a holding that will compel the purchasers of grain from

elevators to look beyond the seller for their title. The substance of the argument is that, as the business cannot be safely transacted if purchases at the terminals are made at the buyer's peril, grave obstacles will be thrown in the way of expeditious trading. Manifestly, this is an argument that might more appropriately be addressed to the legislature. We find that, in so far as the legislature has spoken upon the matter, it has inclined more strongly to the protection of the holders of warehouse receipts and that it has apparently concerned itself more with transactions dependent upon the security behind such receipts than with transactions consummated in the absence of such muniments of title. In these circumstances the argument of convenience cannot prevail.

Stress is also laid on the fact that public warehousemen are required to furnish bonds for the faithful performance of the obligations incident to the business and that the legislative purpose lying back of this requirement is protection to the owners of the stored property. It is argued from this that the liability on the bond is intended to be substituted for the right to follow the property into the hands of an innocent purchaser, in case of insolvency or inability to redeem the receipts. In view of the fact that the surety requirements are equally appropriate whether the holder of the receipt is to have the right to follow his property or whether he is not, no particular significance, in our opinion, attaches to these provisions. Insofar as they give a remedy to the holder of the receipts, the remedy does not purport to be exclusive and no reason is apparent for holding it to be such.

We are of the opinion that the sale to the defendant of the grain stored with the elevator conferred no title and that the plaintiff's grain was converted by the defendant. In support of these views, see McBee v. Ceasar, supra; Tobin v. Portland Mills Co. 41 Or. 269, 68 Pac. 743, 1108; Jackson v. Sevatson, 79 Minn. 275, 82 N. W. 634; Dolliff v. Robbins, 83 Minn. 498, 85 Am. St. Rep. 466, 86 N. W. 772; Young v. Miles, 20 Wis. 615, id. 23 Wis. 643. See also 6 Am. L. Rev. 450.

There are some additional questions discussed in the briefs, but they are of a minor character and do not call for discussion here. Suffice it to say that the plaintiff, as assignee, has a right to maintain the action, and the record shows, by the defendant's own testimony,

that, had a proper demand been made, delivery would have been refused. At any rate, it is questionable whether sufficient demand was not in fact made.

The order of this court is that the judgment be affirmed.

BRONSON, Ch. J., and CHRISTIANSON, J., and BURR and COOLEY, Dist., JJ., concur.

JOHNSON and NUESSLE, JJ., being disqualified, did not participate; Honorable A. G. BURR, Judge of the Second Judicial District, and Honorable CHAS. M. COOLEY, Judge of the First Judicial District, sitting in their stead.